AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California

FILED

OCT 25  PM 2: 26

|  |  |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. **'11 MJ3993** |
| Swiftlogistics888@yahoo.com | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____ Northern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sec. 371, 542, 1001, 1343 | Conspiracy to Defraud the United States, False Statements, Importation of Goods by Means of False Statements, Wire Fraud |

The application is based on these facts:
See attached

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Joseph Mahe, Special Agent of HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/25/11

_____
*Judge's signature*

City and state: San Diego, CA

The Hon. Cathy A. Bencivengo
*Printed name and title*

**ATTACHMENT A**

Yahoo!, Inc., is an Internet service provider with its primary computer information systems and other electronic communications and storage systems, records, and data located at 701 First Avenue, Sunnyvale, CA 94089.

**ATTACHMENT B**
**LIST OF ITEMS TO BE SEIZED**

1.   The officer executing the warrant shall permit Yahoo!, Inc., as custodian of the computer files described below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

2.   Items subject to seizure include all subscriber and/or user information, all electronic mail, images, message, histories, buddy lists, profiles, address books, chat logs, methods of payment, detailed billing records, access logs, transactional data and any other files associated with the following email account:

Swiftlogistics888@yahoo.com

3.   The search of the data supplied by Yahoo!, Inc., pursuant to this warrant will be limited to evidence of violations of Title 18, United States Code, Section 371, 542, 1001 and 1343, between January 1, 2009 and the present, including and limited to:

a.   Communications and attachments between any agent of Gerardo Chavez CHB and any other person regarding goods shipped from China;

b.   Communications and attachments between any agent of Tecate Logistics and any other person regarding goods shipped from China;

c.   Communications and attachments between any agent of Gerardo Chavez CHB and any other person regarding goods intended for transhipment in bond through the United States to another country;

d.   Communications and attachments between any agent of Tecate Logistics and any other person regarding goods intended for transhipment in bond through the United States to another country;

e.   Communications and attachments between the user of the email account to be searched and any person regarding goods shipped from China;

f.    Communications and attachment between the user of the email account to be searched and any person regarding goods intended for transhipment in bond through the United States to another country;

g.    Electronic mail and attachments that provide context to any electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail that identifies any users of the subject account or persons having dominion or control over the account.

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT

I, Joseph E. Mahe, being duly sworn, hereby depose and state as follows:

1.   I am a Special Agent of the United States Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), and I am assigned to the office of the Special Agent in Charge in San Diego, California.   I have been so employed since 2011.   Previously, I was employed as a United States Customs and Border Protection ("CBP") Officer from May 2006 to October 2010. In preparation for my duties as a special agent and CBP officer, I completed the Federal Law Enforcement Training Center Investigator Training Program, the United States Immigration and Customs Enforcement Special Agent Training, the Customs and Border Protection Integrated Training Program, Basic Inadmissibility Secondary Program and the Passenger Analysis Program.   Before working for DHS, I served in the United States Army National Guard as an Infantryman, in preparation for which I completed the United States Army Airborn School and Advanced Infantry Training at Fort Benning, Georgia, in 2001.   I served in support of Operations Noble Eagle and Iraqi Freedom III.   I was honorably discharged from the United States Army in 2007.

2.   As a special agent, I have investigated crimes involving Customs fraud and the importation of controlled substances violations.   Through training and experience, become familiar with the investigation of crimes involving Customs fraud and the importation of controlled substances violations.      Through training, experience, and discussions with other law enforcement

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT

1   officers and agents, I have become familiar with smuggling

2   methodologies and the means by which smugglers communicate, and

3   electronically store, information pertinent to their criminal

4   activities.  I have conducted and assisted several commercial fraud

5   investigations.  In the course of these investigations, I have

6   interviewed witnesses and defendants, and have thus become familiar

7   with the smuggling of illicit, counterfeit and mischaracterized

8   merchandise, and the techniques used by Customs brokers to

9   facilitate this smuggling.

10      3.    This affidavit is in support of an application by the

11  United States of America for a search warrant for Network

12  Solutions, LLC ("Network Solutions"), Microsoft Online Services

13  ("Microsoft"), Yahoo! Inc. ("Yahoo") and Google, Inc. ("Google")

14  (together, the "email companies").  I seek authority to search the

15  service providers, located as described in the respective

16  Attachments A, for the following email accounts, described in the

17  respective Attachments B, paragraph II:

18          Joel@itcmx.net

19          jhoel_vharela@hotmail.com

20          Swiftlogistics888@yahoo.com

21          Enpeso@hotmail.com

22          C.medina.basica@gmail.com

23  from January 1, 2009 to the present, for items which constitute

24  evidence, fruits, and instrumentalities of violations of federal

25  criminal law, namely, Title 18, United States Code, Sections 371,

26  542, 1001 and 1343.

27  //

28  //

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT      2

4.    My knowledge of the facts alleged in this affidavit arises from my training and experience, my participation in the federal investigation described herein, my conversations with other law enforcement officers and agents and my review of records obtained during this investigation.   Because this affidavit is submitted for a limited purpose, I have not included every fact known to me.   When I refer to statements, they are related in substance or in part unless otherwise noted.

<u>STATEMENT OF PROBABLE CAUSE</u>

<u>Summary of the Conduct and Charges Believed</u>

<u>to Have Been Violated</u>

5.    HSI is conducting an investigation into the operation of a Customs brokerage called Gerardo Chavez, CHB ("GCCHB") and a related logistics company called Tecate Logistics.   According to an interview given by Chavez to HSI agents on June 29, 2009, Tecate Logistics maintains an office inside the offices of GCCHB.

6.    Gerardo Chavez is a licensed Customs broker, which means he is legally permitted to engage in "customs business" and act as a Customs broker, per Title 19, United States Code, Section 1641 and other relevant provisions.   In substance, the job of a Customs broker is to learn about the goods his client wishes to bring to the United States and determine their admissibility, Customs classification and value.    A Customs broker also assists his client in filing paperwork required by United States Customs and Border Protection ("CBP").   Much like attorneys or stock brokers, Customs brokers act as agents for their clients.

7.    It is believed that Chavez, GCCHB, Tecate Logistics and others engaged in a scheme to import Chinese manufactured goods

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT        3

1  from China into the United States without paying the proper import

2  duties.  As part of the scheme, it is believed that Chavez and his

3  coconspirators would purchase large shipments of Chinese-made

4  apparel and have it shipped by ocean container from China to the

5  Port of Long Beach in Los Angeles, California.  When the container

6  of Chinese-made apparel arrived, its Customs paperwork would show

7  that its destination was not the United States; instead, it was to

8  be "transshipped" "in-bond" to Mexico.  In-bond transshipments are

9  a routine feature of international trade.  When goods are

10  transshipped in bond through the United States from one country to

11  another, those goods are deemed not to have entered the commerce of

12  the United States and thus are not subject to Customs duties.

13  8.  In Chavez's scheme, instead of completing the

14  transshipment to Mexico, Chavez and his coconspirators would direct

15  a truck driver to drive the container from Long Beach to San Diego.

16  From San Diego, another driver would take the shipment north to one

17  of two warehouses in the Los Angeles area.  The goods would then be

18  sold for a profit and the coconspirators would not pay the

19  appropriate Customs duty.

20  9.  To complete the scheme, Chavez and his coconspirators

21  would generate fraudulent documents that falsely showed the

22  shipments were successfully transshipped from China to Mexico.

23  These documents included a CBP Transportation and Entry form with

24  a forged perforation mark purporting to document the shipment's

25  exit from the United States.  These documents also included a

26  forged "pedimento" purporting to document the shipment's entry into

27  Mexico.

28  //

10. It is believed that this conduct reflects violations of Title 18, United States Code, Section 371 – Conspiracy to Commit Offenses against the United States and Conspiracy to Defraud the United States; Title 18, United States Code, Section 542 – Entry of Goods by Means of False Statements; Title 18, United States Code, Section 1001 – False Statements; and Title 18, United States Code, Section 1343 – Fraud by Wire.

### Surveillance of the July 11, 2011 Shipment

11. On June 30, 2011, HSI agents became aware of ocean container number EGHU9087405 bound for the Port of Long Beach, California from Yantian, China. The unique CBP-generated identification number, or "entry number," for this shipment was 331789640. According to the Transportation Entry and Manifest, the container originated in China and was bound for Conceptos Y Novedades De Mexico Pase, in Sinaloa, Mexico. According to the documents, the container would be transshipped in bond by Tecate Logistics.

12. On July 11, 2011, a trucker picked up the container and drove it to Price Transfer Warehouse in Otay Mesa, California.

13. On July 12, 2011, CBP officers informed HSI special agents that they had conducted an examination of the warehouse and confirmed that container EGHU9087405 had arrived at the warehouse the previous day. They also reported that they had obtained from the warehouse a receipt showing that the container left the warehouse earlier that day. The receipt listed the driver of the shipment as Mario Calzada.

14. On July 14, 2011, CBP officers emailed an employee of GCCHB, Cheyenne Teyechea, at email address cheyenne@itcmx.net to

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT          5

1   inquire about the shipment.   According to Chavez during an
2   interview with HSI agents in 2009, Ms. Teyechea is the logistics
3   coordinator for GCCHB.   To identify the shipment for Ms. Teyechea,
4   CBP officers provided the container and shipment number, as well as
5   a recitation of the dates and times the container entered the
6   United States and was dropped off at the warehouse.

7       15.   On July 14, 2011, Ms. Teyechea, responded to these
8   inquiries using email address cheyenne@itcmx.net.   Ms. Teyechea
9   wrote: "Per our telephone conversation, I am enclosing a perforated
10  copy of the above T&E.  . . .[T]he container was exported to Mexico
11  on 7/12/2011."   Ms. Teyechea included the email address
12  gchavez@itcmx.net in the "cc" line.   Ms. Teyechea attached to the
13  email an electronic copy of the Transportation Entry and Manifest,
14  or "T&E," that purported to bear a sequence of perforated numbers
15  and letters done by CBP upon the shipment's exit from the United
16  States.   In a subsequent email, Ms. Teyechea attached an electronic
17  copy of the pedimento form that purported to document the
18  shipment's entry to Mexico.

19      16.   CBP officers reviewed the Transportation and Entry
20  Manifest provided by Ms. Teyechea.   Typically, CBP will itself
21  retain a copy of the perforated Transportation Entry and Manifest.
22  However, in this case CBP did not have their own copy.   CBP
23  officers familiar with the shape and size of true CBP perforations
24  examined the Transportation Entry and Manifest provided by Ms.
25  Teyechea.   Those CBP officers concluded that the perforations to be
26  fake because they were not of the correct size and shape.
27  //
28  //

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT        6

17.   CBP officers also contacted their counterparts in Mexico to determine whether the pedimento provided by Ms. Teyechea was accurate.  A representative of Mexico's customs apparatus confirmed that no such shipment was imported to Mexico.   Rather, Mexico's records showed the shipment was "cancelled" before arriving in Mexico.

<u>Interview with Mario Calzada</u>

18.   On July 25, 2011, I interviewed Mario Calzada, who had picked up the July 11, 2011 shipment at the warehouse in Otay Mesa. Calzada said that he owned a small Mexico-based freight forwarding company called ML Xpress and that he drove trucks as part of the business.

19.   Generally, Calzada's statements supported our theory of GCCHB's scheme and identified one of the principals.  Calzada said that for about two years he had been working for a man named "Carlos," who paid him about $400 per contract.  Through a six-pack photographic lineup, Calzada identified Carlos as one Carlos Medina.   Calzada said that within those two years there was an approximately six month period that he had not worked with Medina. Calzada confirmed that he had picked up a shipment from the Otay Mesa warehouse on July 12, 2011 and had done so as part of his ongoing business with Medina.

20.   Calzada described what he did for Carlos.  Calzada said that Medina would make a contract and tell him that there was a container ready for pick up at a warehouse.  Calzada would pick up the container and drive it to Truck Net, which is a truck stop located in San Diego, California.  He would then contact another truck driver, Victor Mesa, who was one of his employees.  At Truck

1   Net, Calzada would turn the truck and container over to Mesa, who

2   in turn would drive the container to one of two warehouses in the

3   Los Angeles, California, area.

4        21.   At the Los Angeles warehouse, the goods would be unloaded

5   from the container.   According to Calzada, the ultimate recipient

6   of the shipment was a man named "Sunny."   After the goods were

7   unloaded, Mesa would drive the truck and container back to Medina's

8   warehouse on the corner of Main Street and Maxwell Road in Chula

9   Vista, California.   Medina would then alert Calzada that his truck

10  and empty container were ready to be retrieved.

11       22.   After being alerted that his truck and container were

12  ready, Calzada would pick up the truck and container and return

13  them both to the warehouse.   Finally, Calzada would inform the

14  warehouse that the container had been exported to Mexico and that

15  the recipient was Conceptos Y Novedades De Mexico.

16       23.   According to Calzada, he never actually delivered any of

17  Medina's shipments to Mexico.

18             <u>Enrique Perez and the Main Street Warehouse</u>

19       24.   After speaking with Calzada, I researched Medina using

20  various government databases.   Carlos Medina is a naturalized

21  United States citizen born in Sinaloa, Mexico.   I obtained a copy

22  of a passport application that Medina submitted to the Department

23  of State on his own behalf.   On the application, Medina lists his

24  email address as Carlosmedinaatayde@hotmail.com.

25       25.   I also researched Medina's warehouse at the corner of

26  Main Street and Maxwell Road in Chula Vista, California.   I focused

27  on this warehouse because of its importance to the scheme.   Having

28  spoken  to  other  experienced  agents,  and  drawing  from  my  own

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT          8

1  training in the context of the entire investigation, I believe
2  Medina would hold the returning truck and trailer at the Chula
3  Vista warehouse until he had obtained the fraudulent paperwork
4. showing that the shipment had been exported to Mexico.

5      26.  Using government databases, I saw that Enrique Perez was
6  a principal for one of the companies purportedly located at the
7  same location as Medina's warehouse.   According to currency
8  transaction reports, Enrique Perez is the owner of a bank account
9  into which Medina has made large payments.   For example, on July
10  25, 2011, Medina deposited $50,950 into Perez's account.  Later, on
11  September 6, 2011, Medina deposited $100,000 into Perez's account.

12          Customs Analysis of Tecate Logistics and GCCHB Shipments
13      27.  CBP import specialists analyzed a series of in-bond
14  transshipments for which GCCHB was the Customs broker and Tecate
15  Logistics was the importer.  CBP agents determined that for many of
16  these transshipments, they had no Customs paperwork on file to show
17  that the shipments had exited the United States.  On the occasions
18  that CBP contacted GCCHB and Tecate Logistics for copies of this
19  paperwork, GCCHB and Tecate Logistics provided paperwork bearing a
20  forged perforation.

21      28.  Taking into account these patterns, CBP determined that
22  GCCHB and Tecate Logistics engaged in this diversion scheme on at
23  least forty occasions between 2009 and the present.

24                            Email Accounts
25      29.  On August 22, 2011, the Hon. Cathy A. Bencivengo
26  authorized  a  search  of  email  accounts  gchavez@itcmx.net,
27  cheyenne@itcmx.net and carlosmedinaatayde@hotmail.com.  These email
28  accounts belong to Chavez, Ms. Teyechea and Medina, respectively.

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT          9

1  I performed a search of these email accounts. Generally, the
2  fruits of these searches corroborate our theory of the ongoing
3  scheme. As a result of this search, I identified other email
4  accounts used to further the scheme. I mark those email accounts
5  below in bold.

6      30. During the course of this search, I found an email from
7  Chavez to the email account **Joel@itcmx.net** and
8  rsijhoel@columbiaexport.net. In the email, dated January 14,
9  2010, Chavez requests a pedimento for in-bond number 167306613.
10 This email included an attachment of a notice letter from CBP's
11 Fines, Penalties and Forfeitures office. The notice letter,
12 entitled "Failed to Export and Report Arrival of Merchandise," had
13 been addressed to Chavez and had requested that Chavez provide a
14 Mexican pedimento showing that the in-bond shipment associated with
15 number 167306613 had been exported to Mexico. I found similar
16 emails dated February 22, 2010 and November 26, 2009 in which
17 Chavez makes similar requests for several other in-bond numbers.
18 In these emails, Chavez sends emails to email accounts
19 **Joel@itcmx.net** and rsijhoel@columbiaexport.net, as well as
20 **jhoel_vharela@hotmail.com**. Having analyzed these emails, and
21 having consulted with other experienced agents, I believe that
22 Chavez contacted Joel Varela, the user of email accounts
23 **Joel@itcmx.net** and **jhoel_vharela@hotmail.com** because Varela is the
24 employee charged with creating or obtaining forged pedimentos. I
25 further believe that if Varela is responsible for an indispensable
26 component of the scheme, he is most likely in communication with
27 other coconspirators.
28 //

31.   During the course of the search, I also found the email account of "Sunny," the consignee previously identified by the truck driver Calzada.   In the "contacts" for Chavez's email account, I saw that "Sunny" is a contact whose email address is listed as "**swiftlogistics888@yahoo.com**."   It is probable that Sunny uses the email address **swiftlogistics888@yahoo.com** to communicate with coconspirators.   Those who engage in Customs-related fraud are reliant on email communications.   This is because it is difficult to communicate with widely dispersed manufacturers, shippers, importers, logistics companies and consignees, by means other than email.   This general principle operates with especial force in the context of goods shipped from China to the United States and Mexico.   Telephone calls between the United States and China are expensive.   Furthermore, due to language barriers, businessmen here, in Mexico and in China find it difficult to communicate effectively by telephone.   As an alternative, they use email, which provides a medium for expressing oneself after a period of deliberation through the lingua franca of English. Furthermore, the email account **swiftlogistics888@yahoo.com** includes the term "logistics," a term of art referring to the process of coordinating the transportation of goods, typically in an intermodal fashion in international commerce.   That Sunny would name the account "swiftlogistics" further suggests that he uses this account to talk about his fraudulent Customs activities.

32.   During the search, I also found that Medina uses the email account **c.medina.basica@gmail.com** in addition to the Carlosmedinaatayde@hotmail.com account, which I previously searched.   I reach this conclusion based on the context of email

1   traffic between various parties, as well as the resemblance of the
2   email account **c.medina.basica@gmail.com** to Medina's actual name.
3   On   June   20,   2011,   Ms.   Teyechea   sent   an   email   from
4   cheyenne@itcmx.com to **c.medina.basica@gmail.com**.  In the email, Ms.
5   Teyechea informs Medina that she is "sending . . . the release and
6   in-bond documents for the container that arrived in San Diego.
7   Would you please confirm with me once it is picked up from [the
8   warehouse]?"   Having analyzed these emails, and having consulted
9   with other experienced agents, I believe Ms. Teyechea was asking
10  Medina  to  tell  her  when  a  container  commenced  the  leg  of  its
11  journey from San Diego to the Los Angeles area.   She did this to
12  determine  when  it  was  safe  to  begin  preparing  false  Customs
13  documentation to show the shipment had been exported to Mexico.
14       33.   I   also   found   an   email   from   the   email   account
15  **enpeso@hotmail.com** to **swiftlogistics888@yahoo.com**.  In that email,
16  a person identifying himself as "Enrique" writes, "Dear Sunny and
17  Anil,  ¶ Please check the consignee[.]" Enrique then lists the
18  consignee as "Conceptos y Novedades de Mexico, S.A. ¶ c/o Gerardo
19  Chavez CHB . . . ."   As noted above, Conceptos y Novedades de
20  Mexico, S.A., is the false Mexico-based consignee listed on the
21  Customs paperwork used in the course of the scheme. Having analyzed
22  this email and having consulted with other more experienced agents,
23  I believe that Enrique Perez is "Enrique" who authored this email.
24  I further believe that Perez wrote the email to ensure that the
25  true consignees for the shipment - Sunny and Anil - were aware of
26  the false consignee who would be listed on the paperwork.  In light
27  of this email, and the large deposits made by Medina to Perez, I
28  believe that Perez's role is to help arrange the illicit diversion

1    of these in-bond shipments away from the border to the Los Angeles

2    area.  It should also be noted that because Perez informed Sunny at

3    **swiftlogistics888@yahoo.com** of the false Mexico-based consignee,

4    Perez considers Sunny to be a knowing participant in the scheme.

5                  Genuine Risks of Destruction of Evidence

6         34.  Based upon my experience and training, and the experience

7    and  training  of  other  agents  with  whom  I  have  communicated,

8    electronically stored data can be permanently deleted or modified

9    by users possessing basic computer skills.  In this case, only if

10   the  subject  receives  advance  warning  of  the  execution  of  this

11   warrant, will there be a genuine risk of destruction of evidence.

12        35.  Furthermore, based upon my experience and training, and

13   the  experience  and  training  of  other  agents  with  whom  I  have

14   communicated,  it  is  not  uncommon  for  technically  sophisticated

15   criminals  to  use  encryption,  programs  to  destroy  data  that  can  be

16   triggered  remotely  or  by  a  pre-programmed  event  or  keystroke  and

17   sophisticated techniques to hide data.

18        36.  In this case, Chavez and Ms. Teyechea have shown signs of

19   evasiveness.  Asked about the fate of container number EGHU9087405,

20   they responded with the false assertion that it had been exported

21   to Mexico.  In support of this assertion, they provided false and

22   forged documents purporting to show they had been exported.  As a

23   result, there is a risk that they would respond to knowledge of the

24   investigation by destroying electronically stored evidence.

25              PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

26        37.  Customs  agents  have  asked  Chavez  and  Ms.  Teyechea

27   directly  about  their  shipments,  but  they  did  not  respond

28   truthfully.  This suggests that further inquires with GCCHB and

1   Tecate Logistics would not result in new or helpful evidence, and
2   in fact may spur the destruction of electronically stored evidence.
3   HSI agents have interviewed Calzada about the scheme.  Although he
4   appears to have been largely truthful, his knowledge is limited and
5   he cannot produce copies of emails or other evidence that may be
6   found in the course of an electronic search.  Finally, HSI agents
7   have conducted surveillance on the ongoing scheme, but this, too,
8   failed to uncover email communications that would be revealed in
9   the course of an electronic search.

10                        The Email Companies
11       38.  The email companies, as defined above, are Internet
12   companies which, among other things, provide electronic
13   communication services to their subscribers.  The email companies'
14   email services allow ISP subscribers to communicate with other ISP
15   subscribers and with others through the Internet.  ISP subscribers
16   access ISP's services through the Internet.

17       39.  Subscribers to the email companies use screen names
18   during communications with others.  The screen names may or may not
19   identify the real name of the person using a particular screen
20   name.  Although the email companies require users to subscribe for
21   a free account, they do not verify the information provided by the
22   subscriber for free services.

23       40.  At the creation of an email account and for each
24   subsequent access to the account, the email companies log the
25   Internet Protocol ("IP") address of the computer accessing the
26   account.  An IP address is a unique address through which a
27   computer connects to the Internet.  IP addresses are leased to
28   businesses and individuals by Internet Service Providers.

1    Obtaining the IP addresses that have accessed a particular one of
2    the email companies' accounts often identifies the Internet Service
3    Provider that owns and has leased that address to its customer.
4    Subscriber information for that customer then can be obtained using
5    appropriate legal process.

6                  Procedures for Electronically Stored Information

7         41.   Federal agents and investigative support personnel are
8    trained and experienced in identifying communications relevant to
9    the  crimes  under  investigation.    The  personnel  of  the  email
10   companies are not.   It would be inappropriate and impractical for
11   federal agents to search the vast computer network of the email
12   companies  for  the  relevant  accounts  and  then  to  analyze  the
13   contents of those accounts on the premises of the email companies.
14   The impact on the companies' businesses would be severe.

15        42.   Therefore, I  request  authority  to  seize  all  content,
16   including electronic mail and attachments, stored instant messages,
17   stored voice messages, photographs and any other content from the
18   accounts, as described in Attachment B.  In order to accomplish the
19   objective of the search warrant with a minimum of interference with
20   the business activities of Network Solutions and Microsoft,  to
21   protect the rights of the subject of the investigation and to
22   effectively pursue this investigation, authority is sought to allow
23   the email companies to make a digital copy of the entire contents
24   of the accounts subject to seizure.  That copy will be provided to
25   me  or  to  any  authorized  federal  agent.   The  copy  will  be
26   forensically imaged and the image will then be analyzed to identify
27   communications  and  other  data  subject  to  seizure  pursuant  to
28   Attachment B.  Relevant data will be copied to separate media.  The

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT        15

1   original media will be sealed and maintained to establish
2   authenticity, if necessary.

3        43.  Analyzing the data to be provided by the email companies
4   may require special technical skills, equipment and software.  It
5   also can be very time-consuming.  Searching by keywords, for
6   example, often yields many thousands of "hits," each of which must
7   be reviewed in its context by the examiner to determine whether the
8   data is within the scope of the warrant.  Merely finding a relevant
9   "hit" does not end the review process.  Certain file formats do not
10  lend themselves to keyword searches.  Keywords search text.  Many
11  common electronic mail, database and spreadsheet applications,
12  which files may have been attached to electronic mail, do not store
13  data as searchable text.  The data is saved in a proprietary
14  non-text format.  And, as the volume of storage allotted by service
15  providers increases, the time it takes to properly analyze
16  recovered data increases dramatically.

17       44.  Based on the foregoing, searching the recovered data for
18  the information subject to seizure pursuant to this warrant may
19  require a range of data analysis techniques and may take weeks or
20  even months.  Keywords need to be modified continuously based upon
21  the results obtained.  The personnel conducting the examination
22  will complete the analysis within ninety (90) days of receipt of
23  the data from the service provider, absent further application to
24  this court.

25       45.  Based upon my experience and training, and the experience
26  and training of other agents with whom I have communicated, it is
27  necessary to review and seize all electronic mails that identify
28  any users of the subject account(s) and any electronic mails sent

1   or received in temporal proximity to incriminating electronic mails

2   that provide context to the incriminating mails.

3   46. All forensic analysis of the imaged data will employ

4   search protocols directed exclusively to the identification and

5   extraction of data within the scope of this warrant.

6   <u>Conclusion</u>

7   47. Based on the foregoing, there is probable cause to

8   believe the items identified in Attachment B have been used in the

9   commission of a crime and constitute evidence, fruits, and

10  instrumentalities of violations of Title 18, United States Code,

11  Sections 371, 542, 1001 and 1343 and will be found on the at the

12  premises to be searched as provided in Attachment A.

13

14

15  JOSEPH E. MAHE
    Special Agent
16  Homeland Security Investigations

17  Subscribed and sworn to before me this _25_ day of October.

18

19

20  HONORABLE CATHY A. BENCIVENGO
    UNITED STATES MAGISTRATE JUDGE
21

22

23

24

25

26

27

28

Email Warrant